Simmons *v.* Jacobs.

———◆———

LUTHER M. SIMMONS *& als., in Equity, versus* JOSEPH W. JACOBS *& als.*

The decretal order is the rule for the guidance of a master in chancery in this State.

Unless the order otherwise requires, it is not the duty of a master to report the evidence upon which his determination is founded.

When the order does not require him to report the evidence, no testimony outside of the report touching the points determined in the report is admissible to prove any facts set forth in motions to set aside, or in exceptions to the acceptance of the report.

By c. 150, § 1, of the Public Laws of 1862, no judgment of any Court shall be entered against any party unless such party has been legally served with process, or has appeared and answered thereto personally or by *attorney duly authorized.*

Prior to the time when this law took effect, March 19, 1862, the general appearance of an attorney for parties defendant, rendered an order of notice and service on parties residing out of the State unnecessary.

Where an attorney entered his general appearance, May term, 1858, for several defendants, some of whom were not residents in this State, and, at the October term following, on written motion, he was permitted to enter upon the docket that he limited his appearance so as not to embrace the

Simmons *v.* Jacobs.

non-residents, alleging that he was never authorized to appear for them, but such entry not to be construed as an admission of the fact that his general appearance was unauthorized; and, at the May term, 1862, he had leave to withdraw and *did* withdraw; — *Held,* that testimony offered at the time of withdrawal for the purpose of showing his unauthorized appearance was inadmissible.

By c. 155, § 3, of the Public Laws of 1862, no proceedings shall hereafter be had before any master in chancery, unless appointed under the provisions of this Act, and the case thereafter committed to him.

By R. S., c. 1, § 3, the Act of 1862, c. 155, became effective in thirty days after the recess of the Legislature passing it. — In computing the time, the day on which the Legislature adjourned is to be excluded.

Where the acceptance of the report of a master, duly appointed *prior* to said Act's becoming effective, is objected to *after,* for the reason that the master was not appointed in accordance with the Act; and the report itself shows that the hearing before the master was concluded *before* the Act took effect; *Held,* that the Act did not affect the report.

This Court does not ordinarily take notice of the Resolves of the Legislature, unless produced in evidence.

Where the complainants, having constructed the hull and spars of a vessel, sold eleven-sixteenths to the respondents, embracing therein one-fourth to H. R.; and, on Nov. 15, 1854, having completed all of her requisite fittings, caused her to be enrolled; and, on the day after the enrollment, H. R. gave to the complainants a mortgage bill of sale, with a covenant of warranty, of his one-fourth, together with one-fourth of the masts, bowsprit, sails, anchors, and all the other necessaries thereunto belonging, to secure the payment of two notes of $650 each, payable in three and six months respectively; and, shortly afterwards, while the vessel was on her first voyage, under H. R. as master, he died, insolvent; and the vessel made several voyages, when she was sold by an agent; and, on May 20, 1856, the complainants took possession of the one-fourth covered by their mortgage, and perfected their title on July 20, following; — *Held,* —

1. That H. R.'s one-fourth of the hull and spars should contribute in that proportion to the payment of the "top bills," and that his insolvency conferred no responsibility on the other part owners to make up and pay over to the venders such defalcation; and,

2. That if the master's report charge the respondents with H. R.'s debt for the top bills, and, at the same time, allow the complainants for one-fourth of the proceeds derived from the sale of the vessel including the same articles purchased and charged as top bills, it will be recommitted for inequity.

ON EXCEPTIONS from *Nisi Prius,* APPLETON, C. J., presiding.

BILL IN EQUITY.

The bill alleged substantially : —

That the complainants, in 1854, constructed the hull and·

spars of the brig Crimea; that they sold eleven-sixteenths, in the proportion enumerated—embracing therein one-fourth, to Hiram Robinson—to the respondents; that, in the fall of 1854, they fitted out said vessel with the necessary sails, rigging, &c., and caused her to be enrolled on the 15th of November of the same year; that, on the next day, the said Robinson, being indebted to the complainants in the sum of $1300, conveyed to the respondents, by a mortgage bill of sale, containing a covenant of warranty, his one-fourth part of said vessel together with one-fourth of the masts, bowsprit, sails, &c., to secure the payment of two promissory notes of $650 each, payable in three and six months respectively; that, prior to said enrollment, said J. W. Jacobs was constituted agent of said owners in all matters relating to the hire and employment of said vessel; that said Robinson became master of said vessel, sailing her on shares; that, on Nov. 17, 1854, he sailed for New Orleans, with a cargo of lime, shipped on owners' account; that, on the second or third day out, said Robinson was lost overboard, when Alexander Robinson—the mate—took command; that subsequently, she made several voyages, particularly set forth, earning a large amount, of which the complainants crave account.

The bill further alleges, that, on March 3, 1856, Roland Jacobs, jr., (one of the respondents,) was duly appointed administrator of the estate of said Hiram Robinson, and that he, on August 7, following, represented said estate insolvent, and that commissioners of insolvency were appointed, who made their first report March 3, 1857.

The bill further alleges that the complainants, on May 20, 1856, took possession of the one-fourth of said brig, so mortgaged, and obtained insurance on the same. That, after the sundry voyages aforesaid, all the aforesaid owners united in authorizing Robert R. Snow, one of the respondents, to sell said brig for $10,000, and that he did sell her for that sum.

The bill further alleges that the respondents received

and retain in their hands a greater proportion of the earnings and proceeds of sale of said vessel than their shares therein would entitle them to, on a just and lawful adjustment of all the bills, accounts of earnings and disbursements, and of the proceeds of sale aforesaid, &c.

The bill prayed that the respondents might be required to make true and full answers, &c. ; render just and accurate accounts of earnings, &c. ; and for relief.

The case was, once before this, in Court on demurrer, when the "demurrer was dismissed, and exceptions overruled."

Peter Thacher was appointed master in chancery at the May term, 1862. The defendants filed the following motion to set aside the report of the master offered that term, offering to prove the facts therein set forth.

And now, on the tenth day of the above term, the master's report having been presented to the Court, the following defendants, viz. :—Joseph W. Jacobs, William Medcalf, William H. Medcalf, Cyrus Patterson, Edmund B. Hinckley, Mary T. O'Brien, Stephen B. Starrett, John Lermond and John A. Lermond, come and move this honorable Court that said report may be set aside, and that further proceeding against said defendants may be stayed until the further order of the Court, for the following reasons, viz. : —

1st. Because Ambrose Snow, Joseph S. Burgess and Augustus H. Badger, who are necessary parties to the case, and against whom the award of the master has been made, have never been made parties to this suit, and because they have never been served in any legal manner with process, or in any way brought before the Court, nor have they appeared in this case, either in person or by attorney duly authorized, or in any way submitted themselves to the jurisdiction or authority of this Court, and because this Court cannot, according to the statutes of the State, pass any decree or enter any judgment against the said Snow, Burgess and Badger in this case.

2d. Because no decree or judgment can be recovered

against the defendants, or any of them, without making the said Snow, Burgess and Badger parties to the suit, which has never been done.

3d. Because Peter Thacher Esq., the master, who made said report, has refused to report the testimony offered before him, by which it appeared that the plaintiffs were owners of one-fourth part of brig Crimea, which they afterwards sold to Hiram Robinson, at the time the "top bills" of said vessel were purchased and put upon her, amounting in all to about the sum of $5150. But has found and reported that the said Robinson was owner of said one-fourth part of said brig, at the time of the purchase of said bills, and has therefore charged these respondents with a portion of the loss arising from the non-payment of said Robinson's share of said bills, on account of the insolvency of his estate. Whereas it appeared by the testimony of Luther M. Simmons, one of the plaintiffs, that the said Robinson did not become an owner of the said one-fourth part until after said top bills were purchased and put upon said vessel, which testimony was unopposed and uncontradicted by any testimony or proofs in the case; and the respondents aver that said master has, either by inattention to the evidence, or misapprehension of its character, thus charged the other owners of said vessel with said one-fourth part of the top bills, which should have been charged wholly to the plaintiffs.

4th. Because the said master has neglected and refused to report the evidence which was produced before him, to show, and which, without contradiction, did show that the plaintiffs were mortgagees in possession of one-fourth part of said brig from Nov. 15th, 1855, to July 20th, 1856, and were also the absolute owners of five-sixteenths during the said time, — although these facts did appear without dispute or contradiction before said master; and because said master has neglected to charge the plaintiffs with nine-sixteenths of the losses, expenses and disbursements of said brig during said period, which amounted to about $6000; but does

charge them in said report with five-sixteenths of the same only, and requires the other four-sixteenths of the plaintiffs' share to be paid by the respondents, which findings are unsupported by any evidence which was introduced before him.

5th. Because in his report the said master has charged the respondents with their proportionate part of Hiram Robinson's one-fourth part of all the bills of said brig, including both the top bills of about $5150, and the losses, expenses for repairs, and disbursements of the same prior to July 20th, 1856, amounting to about $6000, which sums so charged to these respondents, as belonging to said Robinson's one-fourth of said brig is $1653,66, and is charged to these respondents in the following proportions, viz. : J. W. Jacobs one-twelfth, S. B. Starrett one-twelfth, John A. Lermond one-twenty-fourth, John Lermond one-twenty-fourth, Mary T. O'Brien one-twenty-fourth, William Medcalf and William H. Medcalf one-twenth-fourth, E. B. Hinckley one-twenty-fourth, Cyrus Patterson one-twenty-fourth, and the said master has also charged one-twelfth of the same to Snow & Burgess, one-twelfth to A. H. Badger and five-twelfths only to the plaintiffs, whereas the whole of said $1653,64 should have been charged to the plaintiffs.

6th. Because the said master proceeded to hear evidence and to consider the case, upon said 18th day of April, at which time his authority had been revoked and annulled, and, between that day and the day of the return of the report, to hear and to consider the case, and act thereupon, as master, without any warrant or authority of law.

The presiding Judge excluded the testimony and overruled the motion.

The defendants offered to prove by depositions, taken by agreement before a commissioner, that Burgess, Snow and Badger, defendants, resident in New York, gave A. P. Gould no authority to appear for them in the case, but the presiding Judge excluded the testimony and accepted the report.

To all which rulings the resident defendants excepted.

*A. P. Gould*, for the respondents.

*Ruggles*, for the complainants.

The opinion of the Court was drawn by

CUTTING, J. — This case is presented on exceptions to the rulings of the Judge at *Nisi Prius*, accepting the master's report, acting under certain decretal orders of this Court, "by which it was ordered, adjudged and decreed that the master be required to inquire and report the amount due to the complainants, with just and equitable interest thereon; and that, for the better taking the account, the master require the production of books, papers and writings in the custody or power of the parties relating thereto, under oath, and examine the parties thereto under oath, on interrogatories, or otherwise, as he shall direct."

It appears that the master, in pursuance of the power thus conferred on him, has attempted to discharge his duty. He has inquired and reported the amount due to the complainants with just and equitable interest thereon, after the production of the books of the parties and their examination under oath, or so many of them as saw fit to obey his summons.

But it is contended by the respondents' counsel, that the master has erred in not reporting all the testimony produced upon the disputed points before him, to this Court, for their supervision, and, for that cause, exceptions are taken to the acceptance of his report, which we will first proceed to consider.

In this State we have no "*Regula Generalis*" in relation to the duties of masters in chancery; but, in each case, where a master is appointed, the rule for his guidance is the decretal order. He is not usually appointed to act merely as a commissioner to take testimony, which any ordinary magistrate might do, but as an officer of the Court to receive and adjudicate upon the force and effect of evidence produced before him, and thus to ascertain facts and form

an opinion as to the law arising thereon, both of which constitute his findings, and are the only subject matter to be inserted in his report to the Court. So that, if his legal conclusions are not sustained by the facts found, the Court may interpose and correct the error. Thus, it has been decided, in *Howe* v. *Russell*, 36 Maine, 115, "a master in chancery is not bound to report the evidence upon which his determination was founded." Again, "where it is referred to a master to examine and report as to particular facts, or as to any other matter, it is his duty to draw the conclusions from the evidence before him, and to report such conclusions only; and it is irregular and improper to set forth the evidence, in his report, without the special direction of the Court." 1 Barb. Ch. Practice, 548, and authorities there cited.

This summarily disposes of much of the testimony taken since the acceptance of the master's report, and overrules all motions and exceptions thereupon presented.

*Again*, it is contended that certain individuals named as respondents in the bill; viz.: *Burgess, Snow* and *Badger*, residing in the city of New York, were never legally notified of its pendency, and that they never appeared or answered either by themselves or counsel duly authorized; and consequently the bill cannot be sustained as against them, or the other respondents, for the want of proper parties. To sustain this proposition the counsel invokes the statute of 1862, c. 150, § 1, which is that—"No judgment of any Court shall be entered against any party unless such party has been legally served with process, or has appeared and answered thereto personally or by attorney duly authorized."

This should have embraced a *proviso*, that, if any attorney shall appear without authority, he shall be liable in damages to the party injured by delay, in consequence of such unauthorized appearance. If such appearance was through inadvertence, the careless and not the innocent party should suffer. But it is to be inferred, from the fore-

going section, that it was intended to relieve both counsel and client from responsibility and leave the injured party without the means of redress. The statute would have been more perfect had it been more comprehensive. But we are to take the law as it is, and not as we might imagine it should have been.

It appears that the bill was duly served on all the respondents who resided within this State, and seasonably entered upon the docket of this Court, and at the same term counsel entered his general appearance, which, as the law then was, rendered an order of notice and service on the residents out of the State unnecessary. *Maine Bank* v. *Hervey*, 21 Maine, 38. And in *Denton* v. *Noyes*, 6 Johns. R., 296, KENT, C. J., remarks,—"By licensing attorneys, the courts recommend them to the public confidence; and, if the opposite party, who has concerns with an attorney, in the business of a suit, must always, at his peril, look beyond the attorney, to his authority, it would be productive of great public inconvenience. It is not usual for an attorney to require a written warrant from his client. He is generally employed by some secret confidential communication. The mere fact of his appearance, is always deemed enough for the opposite party, and for the Court. If his client's denial of authority is to vacate all the proceedings, the consequences would be mischievous. *The imposition might be intolerable.*" Yet, our Legislature of 1862, against the decisions of their own courts, and that of others, composed of some of the most eminent jurists, endowed with great practical common sense and experience, have, for some cause, seen fit to tolerate by a general law this "intolerable imposition." Well did the American jurist pronounce such a course of proceeding intolerable; if, after a delay of years in Court, various issues raised and decided, and great expenses accumulated, the defeated party, as a last resort, could arrest the progress of justice and a final judgment, by the filing of a motion and offering evidence that he had

been represented in Court by "an attorney not duly author-ized."

It may be urged, (but we do not find *any* foundation for such a proposition in the present case,) that the attorney may be either dishonest or irresponsible, and that it would be extremely unjust for a party to be so represented with-out his special authority.   Dishonesty can hardly be im-puted to attorneys, who for years heretofore have been ad-mitted, under modern legislation, to practice in all our Courts, upon the presentation of a certificate from the select-men of *good moral character*, and proof of the payment of twenty dollars each to the county treasurer.   Under such legislation *ignorance* has been no bar to admission, but *dis-honesty* always has.   And, in the case last cited, the learned Judge further proceeds :—"If the attorney has acted with-out authority, the defendant has his remedy against him ; but the judgment is still regular, and the appearance entered by the attorney, without warrant, is a good appearance, as to the Court.   It was, therefore, wisely laid down by the K. B. in the time of Lord Holt, (1 Salk., 88,) that, if the attorney for the defendant be not responsible, or perfectly competent to answer to his assumed client, the Court would relieve the party against the judgment, for otherwise a de-fendant might be undone."

We do not impeach the omnipotence of the Legislature for creating attorneys, as the world was created, out of noth-ing ; or the power to control such eccentric orbs within their appropriate spheres.   Our province is rather to ascertain their orbits, and to harmonize their motions, if possible, with the movements of other bodies.

This brings us to the consideration of the docket entries referred to as a part of this case, and made before and after the recent enactment, viz. :—

"May term, 1858, action entered, and *A. P. Gould* enters his general appearance.   August 4, 1858, notice of motion for leave to amend filed.   September 21, 1858, notice of motion for want of answer filed.   Answers of defendants to

be filed by middle of vacation or bill to be taken *pro-con-fesso.*"

"October term, 1858, *A. P. Gould*, on motion, is permitted by leave of Court to enter upon the docket that he limits his appearance so as not to embrace *Ambrose Snow, Joseph S. Burgess* and *Augustus H. Badger*, alleging that he was never authorized to appear for them. This motion granted, subject however to complainants' rights, and as no admission of the want of such authority. Demurrer filed by leave of Court. Bill taken *pro-confesso. P. Thacher* appointed master."

"January term, 1859, exceptions filed and allowed. July 17, 1860, order received from the Law Court. 'Demurrer dismissed as immaterial and exceptions overruled.'"

"May term, 1862, master's report filed. On his own motion, *A. P. Gould* has leave to withdraw his appearance as to *Snow, Burgess* and *Badger* and *does* withdraw. Exceptions by plaintiffs filed and allowed. Report of master offered for acceptance. Exceptions to report filed. Motion to set aside report filed. Exceptions to motion overruled. Report accepted. Exceptions filed and allowed."

The Act which has been under consideration took effect on its approval by the Governor, which was on March 19, 1862; and the attorney for the New York respondents did not *finally* withdraw his appearance until the following May, after a hearing before the master, whose report had been presented for acceptance; although, at a previous term, he had that liberty, subject to certain responsibilities, which he did not see fit to assume. Under these and other circumstances, known to the Court and the parties, which will appear in an opinion of the Court, before referred to, on the demurrer, but not as yet reported, we have no hesitation in saying that the evidence offered for the purpose of showing an unauthorized appearance was too late and inadmissible, and that the Judge committed no error in rejecting it.

*Again*, the complainants are opposed by another Act of the same year, entitled—"An Act relating to equity pro-

ceedings," approved March 19, 1862, which directs this Court to appoint masters in chancery in each county, not exceeding five in number. Section 3 provides that—"No proceedings shall hereafter be had before any master in chancery, unless appointed under the provisions of this Act, and the case thereafter committed to him," &c. This "statute became effective in thirty days after the recess of the Legislature passing it." R. S. of 1857, c. 1, § 3. The case finds that the respondents' counsel objected to the acceptance of the report, because the master had no authority to act, his original authority having been taken away by force of this statute. Upon this point we refer to the report of the master, who says, "that after due notice to all the parties, they all appeared before me in person, or by counsel, except *Snow*, *Burgess* and *Badger*, upon several previous days therefor appointed in the years 1861 and 1862, and especially upon the 15th, 16th, 17th and 18th days of April, 1862, upon which last mentioned day the hearing before me was concluded." Have we legal evidence before us, or was any such produced to the Judge, who ruled upon this question, as to the time when the Act took effect, or, in other words, when the Legislature took their recess? The burden of proof was upon the excepting party, and no such particular favor is to be extended to him, which would be in violation of all rules of evidence, and operate to suspend all chancery proceedings before duly appointed masters, and render abortive, as in this case, all their prior investigations. It may be a *historical* fact that the pay-roll of the Legislature of 1862 was made up and embraced in a resolve of that year, in which it was declared that the session "commenced on the first day of January and ended on the nineteenth day of March." Ordinarily courts do not notice resolves unless produced in evidence. But, assuming that we recognize the resolve, the excepting party is not thereby benefited; for, even then, excluding the day on which the Legislature took their recess in the computation of the thirty days after such recess, the Act would not

take effect until the nineteenth day of April, the day after the master closed his proceedings. Upon this point, therefore, the evidence offered, and, as subsequently produced, was inadmissible. *Windsor* v. *China*, 4 Maine, 298; *Buttrick* v. *Holden*, 8 Met., 233.

We next come to the consideration of that portion of the case, which embraces the real and only merits involved in the controversy, which is contained in the motion to set aside the report for error in conclusions of law upon the facts found. In order to present that question, it becomes necessary to recite so much of the bill and the findings reported as refers to that subject matter.

The complainants allege that, in 1854, they constructed the hull and spars of the brig Crimea, eleven-sixteenths of which they sold to the respondents, in proportions therein enumerated, embracing one-fourth to *Hiram Robinson*; that, in the fall of 1854, they fitted out said brig with the necessary sails and rigging and all the requisite fittings, and caused her to be duly enrolled, on Nov. 15th of that year; *that*, on the same Nov. 16th, said *Hiram Robinson*, being indebted to them in the sum of $1300, gave to them two notes, payable in equal amounts, one in three and the other in six months, with interest; and, to secure the payment thereof, conveyed to them, by a mortgage bill of sale, his one-fourth part of said brig, together with one-fourth of the masts, bowsprit, sails, boat, anchors, cables and all other necessaries thereunto belonging, with a warranty to defend the said one-fourth part of said brig and all the other before mentioned appurtenances against the claims of all persons; *that*, prior to the enrolment, *Joseph W. Jacobs* was appointed agent of the owners to manage the hire of the vessel and employment; *that* Hiram Robinson took charge as master, sailing on equal shares, and, on Nov. 17, 1854, he sailed for the port of New Orleans with a cargo of 1200 casks of lime purchased and shipped on owners' account; *that*, on the 2d or 3d day after leaving Thomaston, *Robinson* was lost, and *Alexander Robinson*, the mate, took command, who arrived

at New Orleans in the latter part of December, sold the cargo and accounted for the proceeds to *Jacobs*, the agent; *that*, while the brig was at New Orleans, *Robert R. Snow* was appointed master, who sailed on wages and performed several voyages, and paid over to the agent the net earnings; *that*, subsequently, and while the brig was at New Orleans, by authority from the owners, *Snow* sold the brig for the sum of $10,000, who accounted to *Jacobs*, the agent for that sum, — that, on March 3, 1856, *Rowland Jacobs, jr.*, was appointed administrator on the estate of *Hiram Robinson*, which was subsequently rendered insolvent; *that* the complainants, on May 10th of that year, took possession of the one-fourth, under their mortgage, and their title thereto became perfected and absolute on the 20th day of the July following. And, in conclusion, the complainants allege that *Jacobs*, the agent, still retains a portion of the funds belonging to them, or has inequitably paid it over to the respondents, and pray for each to account.

We have seen that the bill was entered in Court, as also a general appearance for the respondents; that, at a subsequent term, for the want of due diligence in the performance of all acts required of them, under our rules for practice in chancery, the bill was taken *pro-confesso*, and the master appointed, whose report is now legitimately before us for the correction of errors as before stated.

That report exhibits a commendable degree of labor, patience and impartiality, and, upon the principal point raised, a sufficient finding as to facts to enable us to correct his conclusions if erroneous, which we proceed to consider.

It is contended by the complainants that, before the sale of the hull and spars, they furnished for the vessel a portion of her top fixtures, and had an account denominated "top bills," for which they have charged in their exhibit a certain amount, one-fourth of which sum they claim should be accounted to them by the owners in proportion to their ownership, in consequence of the insolvency of *Hiram Robinson* and as a *pro rata* contribution for his quarter part of

Simmons *v.* Jacobs.

the top bills. And that proportion we understand to have been allowed to the complainants in the master's report, upon the evidence reported by him as follows, viz.:—"It also appeared in evidence that, by universal custom and usage, when a party purchases a part or the whole of the hull and spars of a vessel then building, he, the purchaser, is liable for the proportion of the top bills belonging to said part or the whole, whether the top bills have been previously purchased or not."

It is unnecessary to consider the number of witnesses by which such custom was attempted to be proved, for it militates in no degree against the proposition of the respondents, but corroborates it; which is, that *Robinson's* quarter should contribute in such proportion, and that his insolvency conferred no responsibility on the other part owners to make up and pay over to the vendors such defalcation.

In order to test the principle, let it be assumed that the builders had completed the vessel in every particular for sea, and then sold the hull and spars in certain proportions; could they subsequently recover by force of the custom the value of the rigging from such purchasers, who might be solvent when the bills for such rigging might be presented? If so, every person, who might purchase a part of the hull, would thereby become a partner with those who might subsequently purchase the remainder, thus constituting them co-partners instead of tenants in common.

Besides; inequity appears from the master's report in another view. The respondents have been charged with *Robinson's* defalcation in the non-payment of his one-fourth of the top bills, notwithstanding which, the complainants have been credited with the same one-fourth of the proceeds of the sale of the vessel including all, both below and above deck; the effect of which would be to receive payment *first* by a contribution by the part owners, and *secondly* by their reception of the same share, embracing hull, sails and rigging. This is attempted to be justified by reason of the sale and mortgage. The sale was the hull and spars and

the mortgage, the same including the rigging, &c.  The latter, so far as it regards the respondents, could not alter or change the relations between the vendors and their co-tenants.

The master's report, therefore, is incorrect in charging the respondents with *Robinson's* debt for the top bills, and at the same time allowing the complainants for one-fourth of the proceeds derived from the sale of the vessel, including the same articles purchased and charged as "top bills," thus indirectly receiving payment twice for the same thing.

Consequently the exceptions *in this particular* are sustained.  Report recommitted to the same master to be revised and reformed, so as to comply with the principles herein enunciated.  Upon his report, thus amended and accepted, costs are allowed to the prevailing parties, and a decree is to be entered in conformity with such amended report.

RICE, APPLETON, DAVIS, KENT and WALTON, JJ., concurred.